IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ANTHONY BOSLEY,

     Plaintiff,

v.                                  Civil Action No.  1:11CV168
                                    (The Honorable Irene M. Keeley)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Defendant," and

sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and

Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security

Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  The matter is awaiting decision on cross motions

for summary judgment and has been referred to the undersigned United States Magistrate Judge for

submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B);

Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I.  Procedural History

Anthony Bosley ("Plaintiff") filed an application for SSI and DIB on February 13, 2008,

alleging disability since October 1, 2005, due to brain injury, spinal problems, back, broken ribs,

degenerative disc disease, anxiety and depression (R. 192-98, 252).   The state agency denied

Plaintiff's applications initially and on reconsideration (R.  113-16).  Plaintiff requested a hearing,

which Administrative Law Judge Stephen Woody ("ALJ") held on January 14, 2010, in

Morgantown, West Virginia., and at which Plaintiff, represented by counsel, Travis Miller, and Larry

Bell, a vocational expert ("VE") testified (R. 59-107). On April 26, 2010, the ALJ entered a decision finding Plaintiff was not disabled (R. 14-23). On April 29, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 27-31).

## II. Statement of Facts

Plaintiff was thirty-seven (37) years old on his alleged onset date; he has a high school education and no past relevant work (R. 52, 258).

School records in the administration record recount that Plaintiff participated in regular classes, graduated from high school, and was ranked one-hundred-fifty-nine (159) out of one-hundred-seventy-four (174) students (R. 309-10).

On February 16, 2006, Plaintiff presented to Braxton Community Health Center to get his "back check[ed]." He reported he was applying for disability due to an automobile accident in 1997 and that he had been "going down hill since." He was prescribed Mobic (R. 328).

On March 15, 2006, Plaintiff presented to Braxton Community Health Center for follow-up of low blood pressure. He reported that "Mobic helped somewhat." Plaintiff was prescribed Skelexin, Cymbalta, and Mobic (R. 327).

On April 18, 2006, Plaintiff presented to Braxton Community Health Center for follow-up treatment of low back pain and depression. Plaintiff reported that "one of the" medications he had been taking made him nauseous and that he had "quit all meds" two weeks earlier. He was prescribed Effexor and Nexium (R. 326).

On May 18, 2006, Plaintiff presented to Braxton Community Health Center for a "checkup" of his back condition. Plaintiff reported his back was "bothering" him and his depression was

improved with Lexapro.  Plaintiff was prescribed Nexium and Cymbalta (R. 325).

On June 15, 2006, Plaintiff presented to Braxton Community Health Center for a follow-up examination for depression, low blood pressure, and gastroesophageal reflux disease ("GERD"). He was prescribed Cymbalta and Aciphex (R. 324).

On June 30, 2006, David Allen, Ph.D., completed a Mental Residual Functional Capacity Assessment of Plaintiff.  He found that Plaintiff was not significantly limited in the "Understanding and Memory" category.  Dr. Allen found, in the "Sustained Concentration and Persistence" category, Plaintiff was not significantly limited in his ability to carry out very short, simple or detailed instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; and make simple work-related decisions (R. 337).  He found, in the "Sustained Concentration and Persistence" category, that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal work day or work week without interruptions from psychologically based symptoms and  perform at a consistent pace without an unreasonable number and length of rest periods (R. 337-38).  Dr. Allen found, in the "Social Interaction" category, that Plaintiff was not significantly limited in his ability to interact appropriately with the general public; ask simple questions or request assistance; or get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Plaintiff was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  In the "Adaptation" category, Dr. Allen found Plaintiff was not significantly limited in his ability to be aware of normal

hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; or set realistic goals or make plans independently of others. Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting (R. 338). Dr. Allen opined Plaintiff retained the emotional and mental residual capacity to adequately perform work in settings that were less demanding socially, e.g., working with things rather than people, and that involved repetitive, routine procedures (R. 339).

On August 9, 2006, Dr. Allen completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had affective and anxiety-related disorders (R. 341). Dr. Allen's diagnosis of Plaintiff's affective disorder was based on Plaintiff's diagnosis of major depressive disorder, recurrent, moderate, and Plaintiff's anxiety related disorder diagnosis is based on his having been diagnosed with anxiety disorder, NOS (R. 344, 346). Dr. Allen found Plaintiff was mildly limited in his activities of daily living and moderately limited in his abilities to maintain social functioning and concentration, persistence or pace (R. 351).

On July 31, 2006, Morgan D. Morgan, M.A., completed a West Virginia Disability Determination Service Mental Assessment of Plaintiff. Plaintiff reported he was driven to the appointment by a "friend." Plaintiff was "cooperative and compliant" during the evaluation. Plaintiff's chief complaints were "chronic pain in his 'whole back'"; a "problem" with his neck, which caused "chronic pain"; and recurrent episodes of depression (R. 330). Plaintiff described his mood as dysphoric. He stated he had difficulty with concentration and attention and that he was experiencing social withdrawal. Plaintiff stated he had difficulty completing tasks, occasionally became frustrated, occasionally displayed irritability, had symptoms of anhedonia, had diminished libido, occasionally became anxious, ruminated over stressors, felt restless, had a history of anger

4

control problems, occasionally experienced difficulty falling asleep, awakened during the night, had rare crying spells, and had adequate energy levels. Plaintiff reported he had attempted suicide in 1988 when he shot himself in the head. Plaintiff reported he did not have any current plans of suicide. Plaintiff stated he had admitted himself to the behavioral unit of St. Joseph's Hospital in "the 1990's" for depression and alcohol abuse; he was a patient for one (1) week. Plaintiff also reported that he had received outpatient psychiatric treatment "for a brief period" in 1989, after he had been released from the hospital after his self-inflicted gunshot wound to the head (R. 331).

Plaintiff stated he had experienced headaches since childhood and chronic back and neck pain caused by an automobile accident. His skull was crushed in a 1968 automobile accident, and he had a self-inflicted gunshot wound to the head in 1988. Plaintiff smoked one (1) package of cigarettes per day. He had a history of alcohol and cannabis dependence. He last drank a beer one (1) week before the evaluation and last used marijuana one (1) month before the evaluation (R. 331). Plaintiff described his cannabis use as "chronic" (R. 332).

M.A. Morgan reviewed a June 29, 2006, medical report completed by Dr. Sabio, and noted the impression were for degenerative arthritis of the lumbar and thoracic spine, migraine headaches, gunshot wound to the head, previous skull fracture and that the "final page of this report was missing[] and the summary section was incomplete" (R. 331).

Plaintiff reported he graduated from high school but "was somewhat unclear but he may have received special education services." Plaintiff reported he had been "placed in a behavioral disorder classroom setting due to a history of poor anger control, fighting and truancy." Plaintiff was retained in first and ninth grades. He obtained his driver's license through a written test. Plaintiff reported his past work was that of a busboy at a restaurant (R. 332).

Plaintiff scored the following on the Wechsler Adult Intelligence Scale – Third Edition ("WAIS-III"): Verbal IQ - 86; Performance IQ - 90; Full Scale IQ - 87. Plaintiff scored the following on the Cognistat: level of attention was alert; orientation was average; attention and memory were mildly impaired; comprehension, repetition, naming, constructions, calculations, similarities and judgment were average (R. 333).

Plaintiff listed the following activities of daily living: rose between 7:00 a.m. and 9:00 a.m.; spent most days at home; maintained his own hygiene; rarely cooked meals but prepared soups and sandwiches approximately three (3) times per weeks; infrequently washed dishes; washed laundry; mowed grass with a push lawnmower, mowing for ten (10) minutes and resting for (10) ten minutes; occasionally drove locally; shopped occasionally with his sister for one (1) hour at a time; watched television for one (1) hour daily; carved wood once a month for one-half (½) hour; occasionally played with his pet cats; and used the computer daily (R. 334-35). Plaintiff stated he socialized with his sister and a few friends, one of whom he visited twice weekly for two (2) hours. Plaintiff did not date and did not attend any organized social events. M.A. Morgan found Plaintiff's social functioning to be moderately deficient; his concentration to be mildly deficient; his persistence and pace to be moderately deficient; and his immediate and recent memories to be within normal limits (R. 335).

M. A. Morgan listed the following as Plaintiff's objective symptoms: no abnormal posture; Plaintiff moved about slowly; his motor behavior was retarded; his mood was dysphoric; his affect was restricted; his intellectual functioning was in the "low average to within the average range." M.A. Morgan diagnosed the following: Axis I - major depressive disorder, recurrent, moderate without full inter episode recovery; anxiety disorder NOS; alcohol dependence, in remission; cannabis dependence, in remission. M.A. Morgan found Plaintiff's prognosis was poor (R. 334).

Dr. Moxley noted, on October 2, 2006, that Plaintiff complained of neck and back pain. He stated his pain was "9 out of 10." Plaintiff also complained of "some depression." Plaintiff reported he was involved in a motor vehicle accident in 1997 during which the vehicle rolled over onto him and he was pinned underneath. He had continued to medicate with Lyrica, Cymbalta, and Aciphex and had previously medicated with Paxil and Prozac. Plaintiff reported Cymbalta "weirds him out." Plaintiff had never medicated with Lexapro or Zoloft. Plaintiff stated "Aciphex help[ed] . . . but [did] not work as well as Nexium in the past." Moxley noted that Plaintiff's x-rays showed "degenerative joint disease, but no other abnormalities." Plaintiff described his symptoms as "numb, tender area in the back of the cervical area and . . . some low back pain" (R. 355, 405).

Plaintiff's physical examination produced normal results; however, it was noted that his head had "some abnormal shaped bones in the frontal, peroncal area, secondary to an accident when he was a child." His deep tendon reflexes were 2/4; his muscle strength was 5/5 (R. 355, 405). Plaintiff's cranial nerves were grossly intact; he had "good alternating fine and gross motor skills." He could heel and toe stand; his Romberg was negative. Dr. Moxley's assessment was for neck and back pain, secondary to muscle strain, seasonal allergies, "viral symptoms," tobacco abuse, and GERD. Dr. Moxley prescribed Soma, Astelin, Albuterol, and Nexium (R. 356, 404).

On November 8, 2006, Plaintiff presented to Dr. Moxley for follow-up treatment of his neck and back pain. Dr. Moxley noted that Plaintiff had complained of neck and back pain at a level nine (9) out of ten (10) the last time Dr. Moxley had examined Plaintiff. Plaintiff stated he had experienced "some depression" after a motor vehicle accident in 1997. Plaintiff stated he had medicated in the past with Lyrica, Cymbalta, Aciphex, Paxil, and Prozac and Cymbalta and they "weird him out." Dr. Moxley noted Plaintiff complained of neck and hip pain subsequent to the

1997 motor vehicle accident." Dr. Moxley opined that Plaintiff's "[x]-rays show[ed] degenerative joint disease, but no other abnormalities." Plaintiff complained of "numb[,] tender area on the back and the cervical area" and low back pain. Plaintiff stated he had "been a little bit better." Plaintiff currently medicated with Lyrica, Aciphex, Cymbalta. Plaintiff stated Nexium treated his symptoms better than Aciphex did. Dr. Moxley prescribed Nexium to Plaintiff. Plaintiff stated the "Soma" worked quite well for him, but it wore off." Plaintiff stated his pain was a six (6) or a seven (7) out of ten (10). Plaintiff stated that overhead work and lifting a gallon of milk from a counter caused increased pain. Plaintiff stated his pain could be "nagging"; he stated he had episodic low back pain and generalized back pain, which was "more of a dull[,] achy type pain." Dr. Moxley noted that the pain did not "seem to be interfering with anything that he [was] doing." Dr. Moxley's review of Plaintiff's systems was negative (R. 402). Dr. Moxley found Plaintiff had "no spinous processes tenderness"; "no real tenderness over the paraspinal muscles"; "[m]inimal tenderness in the lumbar area to palpation, bilateral over the S1, just no calor, rubor or tumor"; "[p]alpation of the anterior trap on the right elicit[ed] pain, bogginess and tenderness, also in the posterior trap there [was] some anterior shoulder pain"; "some pain at the right lateral epicondyle"; and "increasing pain with internal rotation" of the right arm." Dr. Moxley's assessment was "probably chronic neck strain, possibly supraspinatus tendonitis in the right shoulder and right lateral epicondylitis." Plaintiff elected to receive a cortisone injection (R. 401).

Plaintiff received a cortisone injection on November 8, 2006 (R. 400). He stated that he realized "probably 80% relief." He stated his "shoulder felt significantly better." Dr. Moxley prescribed Ketoprofen and increased Plaintiff's dosage of Soma (R. 401).

On December 15, 2006, Dr. Osborne completed a Physical Residual Functional Capacity

Assessment of Plaintiff. Dr. Osborne found Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 364). Dr. Osborne found Plaintiff had no postural, manipulative, visual, communicative or environmental limitations (R. 365-66).

Dr. Moxley examined Plaintiff on January 14, 2007, for neck and back pain. Plaintiff stated his pain was "8 out of 10." Plaintiff reported that the steroid injection he had received had "helped for about two to three weeks and then it quit working." Plaintiff stated he felt pressure next to his spine, which caused his neck to be "stiff" and which radiated down into his arm. Plaintiff described the pain as "burning"; prolonged standing and sitting exacerbated his pain. Plaintiff reported he experienced numbness if he lay down and "increase[d] pain with overhead work." Dr. Moxley opined Plaintiff had "some tenderness over the lumbar area to palpation and bilaterally over the S1." Plaintiff had pain with palpation of the anterior trap. Plaintiff's drop-arm test was negative (R. 398).

Plaintiff's examination was normal. His deep tendon reflexes were 2/4. His straight leg raising test was negative. There was increased pain with internal rotation. Plaintiff was positive for "some tenderness over the right lateral epicondyle." Plaintiff had decreased weakness in his right arm; however, Dr. Moxley "question[ed] whether he [was] giving his full effort. Dr. Moxley ordered a MRI (R. 397-98).

On March 5, 2007, Plaintiff presented to Dr. Moxley with neck pain. Plaintiff reported he had medicated with Ketoprofen, which "did seem to help." Dr. Moxley noted Plaintiff had initially "complained of some pain on the left side with weakness on the right side" but that he now complained of right-side pain and weakness. Plaintiff had no numbness or tingling; pain radiated

to the middle of his right shoulder. Plaintiff described his pain as "throbbing" and as a four (4) or five (5) out of ten (10). Plaintiff stated his pain was "a lot less than it had been previously." Plaintiff stated he occasionally felt "like there [was] a knot on the back of his neck" and that the pain "radiate[d] up into the neck over the superior portion of the scapula into the right arm." Plaintiff stated that movement caused the pain to worsen and it was "worse at the end of the day." Plaintiff medicated with Soma and Nexium (R. 395).

Plaintiff's examination was normal, except he had "slightly decreased range of motion at the right upper extremity." Dr. Moxley noted that, when he tested Plaintiff's muscle strength, he "really question[ed] if the patient [was] giving [him] his best effort as far as grip strength and flexion and extension at the elbows" (R. 395). Dr. Moxley noted Plaintiff was positive for "some tenderness over the anterior left shoulder." Plaintiff had "increasing pain with internal rotation." Plaintiff's drop-arm test was negative; however, he showed "some weakness with abduction right compared to the left." Dr. Moxley diagnosed right shoulder pain (R. 394).

Plaintiff's March 7, 2007, cervical spine x-ray showed "degenerative disk changes with foraminal narrowing bilaterally at C5-6" (R. 372, 408).

Plaintiff's March 30, 2007, head x-ray showed "several small metallic foreign bodies project in the medial right orbit. MRI is contraindicated." It was noted that Plaintiff was "scheduled for MRI - . . . never told us about old gunshot wound to head. MRI canceled" (R. 371, 407).

On April 10, 2007, Plaintiff presented to Dr. Moxley for follow up to his March 30, 2007, x-rays. Plaintiff stated that the metal foreign bodies were "actually bullet fragments from a self-inflicted gunshot wound many years ago." Plaintiff was negative for suicidal or homicidal ideations. Plaintiff stated he experienced pain on the right side of his neck, which was exacerbated by twisting,

turning, and bending. Plaintiff described his pain as dull and achy (R. 391-92).

On October 10, 2007, Dr. Hebard examined Plaintiff for cervical disk pain. Upon examination, Dr. Hebard noted Plaintiff's affect was abnormal. Plaintiff's strength and sensation were abnormal. Plaintiff was positive for pain and stiffness (R. 386). Dr. Hebard prescribed Nexium, Soma and Hydrocodone to Plaintiff (R. 384-85). Dr. Hebard referred Plaintiff to Dr. Weinstein, a neurosurgeon, for a consultative examination on October 11, 2007 (R. 383).

On November 1, 2007, Dr. Weinstein wrote to Dr. Hebard relative to Plaintiff's "cervical problem." He noted Plaintiff could not have a MRI because he "retained metal fragments" in his head. Dr. Weinstein wrote that Plaintiff should "exercise[] and walk[] for an interval which may be effective in relieving his syndrome and obviating the necessity of him going through a myelogram and even considering surgery st some point." Dr. Weinstein instructed Plaintiff to walk for three (3) to five (5) miles per day and perform isometric exercises. He noted that if exercise and walking did not cause Plaintiff to "get better," he would order a cervical myelogram CT scan (R. 374, 376, 410).

Dr. Hebard prescribed hydrocodone November 7 and 11 and December 10, 2007 (R. 381-82).

Plaintiff's December 18, 2007, cervical myelogram showed moderate stenosis at C5-C6 and "degenerative disc disease with possible right-sided herniated disc" (R. 377).

Plaintiff's December 18, 2007, post myelogram cervical spine CT showed "multilevel degenerative disc disease with posterior slight ptosis and a disc bulge left posterior paracentral C4-C5 with mild cord flattening" and "right exit foramen encroachment due to bulging or possible herniated disc superimposed on generalized degenerative disc change at the C 6/7 level" (R. 378).

On December 20, 2007, Dr. Weinstein wrote to Dr. Hebard relative to Plaintiff's myelogram CT scan. Dr. Weinstein noted Plaintiff had "some definite pathology at 5-6 related to degenerative

disc disease[,] . . . some modest pathology at 4-5 and some pathology at 6-7 on the right." Dr. Weinstein opined that Plaintiff did "not absolutely have to have surgery at this point and in fact, he is inclined not to have it now." Dr. Weinstein wrote that there was "definitely pathology and [Plaintiff] may require surgery if not now, in the future at some time." Dr. Weinstein recommended Plaintiff do isometric exercises (R. 373, 375, 409).

On January 8, 2008, Plaintiff reported to Dr. Hebard that his pain "remain[ed]" and that it "hurt more [in] damp & rainy weather." Plaintiff was positive for muscle pain and stiffness (R. 380).

Dr. Hebard prescribed hydrocodone to Plaintiff on February 10, 2008 (R. 379).

On March 11, and April 1, 2008, Patrick Whaley, M.A., under the supervision of Ronald D. Pearse, Ed.D., a licensed psychologist, completed an assessment of Plaintiff, who had been referred by Tina Facemire of the Braxton County Department of Health and Human Resources for the purpose of his continuing his eligibility for Medicaid. Ms. Facemire also requested Dr. Pearse attain information "on diagnosis, prognosis, employment limitations, and capacity for independent living."

Plaintiff informed Mr. Whaley that he had "degenerative joint disease from a car wreck in 1997" and he had been depressed since 1987, when he graduated from high school. Plaintiff reported he experienced poor energy, poor motivation and significant pain when he did physical activities. Plaintiff reported that "in the summer [when] he attempt[ed] to help [in] his sister's yard, his back [could] become very painful and he usually [lay] in bed for 2 to 3 days after doing yard work." Plaintiff lived with his sister and had held "several jobs." Plaintiff was dressed appropriately and "displayed good manners." He was transported to the appointment by a family member (R. 480). Plaintiff reported numbness in his arms and legs. He had, "at times," difficulty walking. Plaintiff reported he was involved in an automobile accident in 1968 and had attempted suicide in

1987.   Plaintiff reported poor sleep, concentration, energy; depressed mood; and feelings of hopelessness.  Plaintiff reported he had undergone counseling at United Summit Center two (2) or three (3) times but quit because "he didn't feel comfortable with the therapist."  Plaintiff reported he had been hospitalized for the suicide attempt.  He had GERD, degenerative joint disease, and chronic pain. He had abused alcohol and marijuana, but had abstained for the past three (3) or four (4) years.  Plaintiff reported he smoked one (1) package of cigarettes per day (R. 481).

Plaintiff reported he graduated from high school in 1987.  Mr. Whaley noted there "were no reports of him being in special education."  Plaintiff reported he had experienced disciplinary "problems with truancy, fighting, and arguing."  Plaintiff had a "history of failing some classes during his high school curriculum."  Plaintiff reported he had been "employed by (sic) several minimum wage places" such as a diner and restaurant, car wash, and tree cutting service.  Mr. Whaley noted Plaintiff had "equipment operation experience through his job experience."  Plaintiff reported he related "well with co-workers and supervisors" and had "never been placed on any type of employment limitation or restriction."  Plaintiff stated he was reared by his father and sister; he and his family were "somewhat close" and gathered at Christmas; he had never married; he felt "uncomfortable in some social situations"; he would "rather 'stay by himself'" (R. 481). Plaintiff stated his "sister usually prompt[ed] him to help out with certain things, (sic) otherwise he would generally forget and just stay in his room or watch TV" (R. 482).

Upon examination, Mr. Whaley observed Plaintiff was cooperative and compliant, introverted, was oriented as to time, name, place and date, and had no suicidal or homicidal ideations.  His speech was relevant and coherent, mood depressed, affect flat, thought process and content normal, perception normal, insight fair, judgment normal, immediate memory and recent

memory mildly deficient, remote memory without "noted distortions," concentration mildly deficient, and psychomotor behavior "fidgety and tense" (R. 482).

Plaintiff scored the following on the Wechsler Abbreviated Scale of Intelligence ("WASI"): Performance IQ 96; Verbal IQ 86; Full Scale IQ 89. He found Plaintiff was "within the low average range of intellectual functioning" (R. 482). On the Wide Range Achievement Test - Third Provision ("WRAT - III"), Plaintiff scored as follows: reading - third grade; spelling - fourth grade; arithmetic - seventh grade (R. 482). Mr. Whaley noted that, on the Millon Clinical Multiaxial Inventory-III ("MCMI-III"), Plaintiff's responses showed "areas of schizoid characteristics," which could manifest in periods of apathy, distancing from family members, and lack of desire and incapacity to experience pleasure. Plaintiff's responses were consistent with depressive characteristics, self-defeating characteristics, anxiety patterns, and major depression (R. 483).

Mr. Whaley's diagnostic impressions were as follows: Axis I - major depressive episode, moderate, recurrent, and anxiety disorder, not otherwise specified; Axis II – no diagnosis; Axis III - history of head trauma; back, shoulder, and neck pain; acid reflux; and degenerative joint disease; Axis IV - "problems with [a]ccess to [h]ealth [c]are [s]ervices"; Axis V - GAF 50 (R. 483). Mr. Whaley found Plaintiff's responses on the MCMI - III "showed areas of concern with schizoid characteristics, depressive characteristics, self-defeating characteristics, anxiety characteristics, alcohol dependence and major depression characteristics." Mr. Whaley opined Plaintiff's depression caused "depressed mood most of the day, diminished pleasure and interest in all activities, loss of appetite, insomnia, loss of energy, feeling of worthlessness, diminished ability to think or concentrate," and significant distress or impairment in his social, occupational, and interpersonal relationship functioning. Plaintiff's anxiety disorder caused physical discomfort when he was in a

stressful situation. Mr. Whaley recommended Plaintiff "refrain from any employment opportunities due to his depressive symptoms and anxiety symptoms[] as well as his medical problems. It [was] recommended that his employment limitations be indefinite until his depressive and anxiety symptoms ha[d] been alleviated or ha[d] improved. It [was] recommended that once he complete[d] several months of individual therapy and medication management that he be reevaluated for employment capability" (R. 483-84). Mr. Whaley opined that Plaintiff should "continue living with family members that can help and support him due to his emotional and physical needs." Mr. Whaley found that therapy and medication management treatments could "help improve [Plaintiff's] daily functioning." Mr. Whaley found Plaintiff could "consider further job training . . . once his depressive and anxiety symptoms [had] improved" (R. 484).

Dr. Hebard prescribed hydrocodone and Soma to Plaintiff on May 12, 2008 (R. 470).

On May 14, 2008, Arturo Sabio, M.D., completed a West Virginia Disability Determination Service report for Plaintiff. Plaintiff's chief complaints were for "[b]rain injury, spinal problems, back problems, broken ribs, degenerative disk disease, anxiety, and depression." Dr. Sabio reviewed health records from the Dr. Boyce from the Braxton Community Health Care Center, who had diagnosed Plaintiff with osteoarthritis, depression, and GERD. Plaintiff reported that he experienced depression since childhood; he attempted to commit suicide by shooting himself in the head. Plaintiff stated he did not have any suicidal ideations or hallucinations. He was afraid of crowds. Plaintiff stated that he was not receiving psychotherapy and he was not taking any medication for depression (R. 431). Plaintiff stated he was involved in motor vehicle accidents in 1968 when he was a baby and then in 1997 (R. 431-32). He had metal fragments behind his eyes which were caused by the self-inflicted gunshot wound. Plaintiff stated he experienced severe headaches; he had

no numbness in his arms and legs (R. 431). He had neck and low back pain. Plaintiff stated x-rays showed degenerative arthritis. He had been evaluated by Dr. Weinstein, who recommended surgery, but Plaintiff did not undergo surgery because "he was scared of an operation." Plaintiff stated his neck pain radiated to his right arm and it was relieved with medication. Plaintiff stated he experienced "aching in the lumbar spine," which was intermittent and which radiated to both legs. Plaintiff had no lower extremity weakness but experienced increased pain with repetitive bending, lifting "just" twenty (20) pounds, prolonged sitting for more than thirty (30) minutes, and ambulation of twenty (20) minutes. He smoked one-half (½) package of cigarettes per day; he had not consumed alcohol in three (3) years. Plaintiff reported he had a high-school diploma and last worked in 2005. Plaintiff stated he medicated with hydrocodone, Soma, and Nexium (R. 432).

Upon examination, Dr. Sabio found Plaintiff was alert and oriented as to time, place and person. He had a "visibly constricted affect with psychomotor retardation[1]." Plaintiff could hear and understand (R. 432). Plaintiff's hearing was normal. He had a normal gait and did not use an ambulatory aid. Plaintiff had tenderness, upon palpation, in both hips. He had no evidence of acute inflammation in any of the joints of the upper and lower extremities. Plaintiff was positive for tenderness over the spinous processes of the lumbar spine and tenderness over the third and fourth thoracic spinous processes (R. 433).

Dr. Sabio's neurologic examination showed Plaintiff was alert and oriented, to time, place and person. His cranial nerves were grossly normal. Plaintiff's sensory function to light touch and pinprick was intact throughout. Plaintiff's motor strength was 5/5, bilaterally, in both the upper and

---

[1]Psychomotor retardation: generalized slowing of mental and physical activity, as is common in depression and in catatonic schizophrenia. *Dorland's Illustrated Medical Dictionary*, 32nd Ed., 2012, at 1631.

lower extremities. Plaintiff's deep tendon reflexes were normal. Plaintiff could walk on his heels and toes; he could heel-to-toe walk in tandem. Plaintiff was able to stand on either leg separately; he could squat fully. Plaintiff's fine manipulations movements were normal (R. 434).

Dr. Sabio diagnosed degenerative arthritis, lumbar spine; chronic neck pain; depression. Dr. Sabio noted Plaintiff's memory was intact (R. 434-35).

Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity Assessment of Plaintiff on June 3, 2008. Dr. Franyutti found Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour work day; sit for a total of about six (6) hours in an eight (8) hour workday; and unlimited push/pull (R. 437). Dr. Franyutti found Plaintiff could occasionally climb ramps and stairs, kneel, crouch, and crawl. Dr. Franyutti found Plaintiff could never climb ladders, ropes, or scaffolds. Dr. Franyutti found Plaintiff could frequently balance and stoop (R. 438). Dr. Franyutti found Plaintiff had no manipulative, visual or communicative limitations (R. 439-40). Dr. Franyutti found Plaintiff was unlimited in his exposure to wetness, humidity, noise, fumes, odors, dusts, gasses and poor ventilation. Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold and heat, vibration, and hazards (R. 440). Dr. Franyutti noted Plaintiff had "no problem" with his personal care, preparing meals, doing household chores. Plaintiff "tr[ied] to read, watch[ed] TV, need[ed] to move around because of pain & stiffness of back, sle[pt] poorly because of pain, [did] laundry, clean[ed] room, shop[ped] for food. Condition affect[ed][] lifting, squatting, bending, standing, walking, kneeling, stair climbing, walk 300 yards. Claimant [was] partially credible" (R. 441). Dr. Franyutti considered the September, 2007, DHHR examination report and the December, 2007, cervical myelogram results (R. 443).

Dr. Hebard prescribed hydrocodone and Soma to Plaintiff on June 12, 2008 (R. 469).

On June 25, 2008, Psychologist Robert J. Klein, Ed.D., completed an Adult Mental Status Examination of Plaintiff. Plaintiff had a valid driver's license. He had a positive attitude; he was cooperative. His posture appeared to be slightly slumped; his gait was uneven; he was not using any ambulatory aids. Plaintiff stated he had "suffered brain injury at the age of 9 months in an automobile accident." He was in Behavior Disorder Classes in High School due to what appeared to be ADHD. He had attempted suicide in 1988 with a self-inflicted gunshot wound to his head. He had an automobile accident in 1997 in which he suffered 2 broken collarbones, broken ribs and spinal injuries. "He ha[d] a degenerative disc disease in his neck with and continued spinal problem. He [was] under treatment for this condition, and [was] on medication for pain." Plaintiff reported he last worked in 2004 and quit because of his "back problems." Plaintiff had not attempted to work again except "to do some odds and ends mowing of lawn when his pain [was] not severe." Plaintiff reported he slept poorly due to back pain; his appetite was "good"; his energy level was "fair"; he had no suicidal thoughts; he had no panic attacks; his mood was "fair"; he felt "discouraged"; he was nervous; he had difficulty concentrating; he was mentally restless. Dr. Klein noted there was a "strong suggestion of depression . . which [Plaintiff] did not seem to fully understand" (R. 444). Dr. Klein reviewed medical records from Braxton Community Health Center and noted Plaintiff had been prescribed Cymbalta and Lexapro. Dr. Klein noted Plaintiff had been "treated in the past 80s by Summit Center relating to his suicide attempt" but had received no other treatment for depression and was not "on any medications for anxiety or depression" (R. 446).

Upon examination, Dr. Klein found Plaintiff's appearance was casual; hygiene and grooming were appropriate; posture was slightly slumped; and gait was unsteady. Dr. Klein noted Plaintiff

"appeared to be introverted." Plaintiff's cooperation was good; social interaction during evaluation was within normal limits; eye contact was good; verbal responses were within normal limits; speech was relevant; oriented times three; mood was mildly dysphoric and anxious; affect was flat; and thought process was within normal limits. Dr. Klein noted Plaintiff had a sense of humor; he was not spontaneous. Plaintiff's thought content was within normal limits; perception was within normal limits; insight was mildly deficient; immediate memory was normal; recent memory was mildly deficient; remote memory was mildly deficient; comprehension was mildly deficient; concentration was moderately deficient; pace was within normal limits; and psychomotor behavior was retarded. Dr. Klein found Plaintiff's social functioning to be mildly deficient (R. 446).

Dr. Klein listed Plaintiff's activities of daily living as follows: rose about 7:30 a.m.; retired about 11:00 p.m.; "may eat breakfast and all other meals"; showered; watched television; did not listen to radio; cared for his own personal hygiene; helped with cooking, cleaning, and household chores; mowed the lawn. Wood carving was his hobby (R. 446). Dr. Klein's impressions were as follows: Axis I - major depressive disorder, mild, and alcohol dependence in remission; Axis III - spinal, back and hip "problems," degenerative neck disc, GERD and "brain injury at birth." Dr. Klein found Plaintiff "may have had ADHD Combined as an adolescent. He did appear to meet the necessary DSMIV - TR criteria for Major Depressive Disorder, Mild. He did appear to have a diagnosis of Alcohol Dependence in remission. He appeared to have significant medical problems. His level of intellectual functioning could possibly be at the Borderline Level." Dr. Klein found Plaintiff's prognosis was "poor," but that he could manage his own finances (R. 447).

On July 1, 2008, Joseph A. Shaver, Ph.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had an affective disorder, major depressive disorder, mild, and a

substance addiction disorder, alcohol dependence, in remission (R. 448, 451, 456). Dr. Shaver found Plaintiff had mild restrictions in his activities of daily living and in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. Dr. Shaver found Plaintiff had experienced no episodes of decompensation (R. 458).

Dr. Shaver completed a Mental Residual Functional Capacity Assessment of Plaintiff on July 1, 2008. Dr. Shaver found Plaintiff was not significantly limited in the categories of ability to understand and remember, social interaction, and adaption (R. 462-63). As to Plaintiff's ability to sustain concentration and persistence, Dr. Shaver found Plaintiff was not significantly limited in his ability to carry out very short, simple instructions and detailed instructions; ability to sustain ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; and ability to make simple work-related decisions. Plaintiff, according to Dr. Shaver's finding, was moderately limited in his ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and ability to complete a normal work day or work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 462-63). Dr. Shaver based his findings on Dr. Klein's June 25, 2008, evaluation of Plaintiff (R. 464).

Plaintiff presented to Dr. Hebard on July 9, 2008, for a three (3) month follow-up appointment for muscle pain, tenderness and stiffness. Plaintiff's neck was stiff. Dr. Hebard noted Plaintiff was positive for degenerative joint disease of the cervical spine (R. 468). Dr. Hebard prescribed hydrocodone, Soma, and Nicoderm to Plaintiff (R. 466).

Dr. Hebard prescribed hydrocodone, Soma, and Nexium on August 7, 2008 (R. 515).

On September 1, 2008, Dr. Hursey reviewed the July 1, 2008, reports of Dr. Shaver and affirmed them. Dr. Hursey noted Plaintiff "appear[ed] to have problems at this time due to physical complaints vs mental/emotional factors" (R. 471).

On September 8, 2008, Dr. Hebard prescribed hydrocodone and Soma to Plaintiff (R. 514).

On September 23, 2008, Dr. Lauderman, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Lauderman found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour work day; sit for a total of about six (6) hours in an eight (8) hour work day; and push/pull unlimited (R. 473). Dr. Lauderman found Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Lauderman found Plaintiff could occasionally balance (R. 474). Dr. Lauderman found Plaintiff had no manipulative, visual or communicative limitations (R. 475-76). Dr. Lauderman found Plaintiff should avoid concentrated exposure to extreme heat and cold but was unlimited in his exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 476). Dr. Lauderman reviewed Dr. Hebard's July 9, 2008, medical report (R. 479).

On October 7, 2008, Plaintiff presented to Dr. Hebard with complaints of left hand weakness and decreased range of motion in his left shoulder (R. 513). Dr. Hebard prescribed hydrocodone and Soma to Plaintiff (R. 512).

On November 5, 2008, a notation was made by Dr. Hebard's staff that Plaintiff's sister contacted the office and informed staff that Plaintiff was "applying for disability and his lawyer recommend[ed] neurology consult" and wanted to know if Dr. Hebard needed "to see him first or go ahead and schedule with neurology." Dr. Hebard noted that Plaintiff was due for his routine

follow-up examination in January and that if Plaintiff was considering "surgical intervention we would need to send him to a neurosurgeon for CT-myelogram. He had metal fragments from gunshot in his head and can't get MRI's (sic)." Dr. Hebard further noted that if Plaintiff's lawyer wanted "other evaluations we can give" Plaintiff Dr. Navada's "# to call." Dr. Hebard's staff noted that Plaintiff would be so informed (R. 511).

Dr. Hebard prescribed Soma and hydrocodone on November 10 and December 8, 2008 (R. 508, 510).

On January 5, 2009, Dr. Hebard found Plaintiff had reduced range of motion and strength in his head, neck, and upper extremities. Plaintiff stated he experienced right shoulder pain and he had "trouble sleeping." Plaintiff stated he managed his activities of daily living; he washed dishes, swept floor and did laundry (R. 507). Dr. Hebard prescribed hydrocodone and Soma to Plaintiff (R. 506).

Dr. Hebard prescribed hydrocodone to Plaintiff on February 10, 2009 (R. 504).

Dr. Hebard prescribed Nexium and hydrocodone to Plaintiff on March 10, 2009 (R. 502).

On April 2, 2009, Dr. Hebard examined Plaintiff and found he was positive for back pain and tenderness (R. 501). Dr. Hebard prescribed hydrocodone to Plaintiff (R. 500). Plaintiff was instructed to return in three (3) months (R. 501).

On April 14, 2009, Plaintiff telephoned Dr. Hebard and informed him that he had been prescribed Celexa by Dr. Navada. Plaintiff requested a prescription for wrist braces for carpal tunnel syndrome. Dr. Hebard prescribed right and left wrist braces for Plaintiff for bilateral carpal tunnel syndrome (R. 498).

Dr. Hebard prescribed hydrocodone to Plaintiff on May 11, 2009, and Lortab on June 11, 2009 (R. 494, 496).

On July 2, 2009, Plaintiff was examined by Dr. Hebard. He found Plaintiff's back muscles were stiff and painful and Plaintiff was depressed. He noted Plaintiff had been diagnosed with degenerative joint disease and chronic pain (R. 493). Dr. Hebard prescribed Soma Lortab; Plaintiff was instructed to return in one month (R. 492-93).

Dr. Hebard prescribed Lortab to Plaintiff on August 5, September 10, and October 8, 2009 (R. 488, 485, 490).

Administrative Hearing

On January 14, 2010, ALJ Woody conducted an administrative hearing. Plaintiff testified he lived in a trailer with his sister and niece (R. 69-70). Plaintiff testified he had a driver's license and he could drive for short distances (R. 70). Plaintiff stated that if he drove a great distance, his back would hurt. Plaintiff testified he graduated from high school and had been enrolled in behavioral classes due to behavioral problems (R. 71). Plaintiff stated he had difficulty reading and writing. Plaintiff could do simple math. While in school, Plaintiff took vocational classes in welding (R. 72). Plaintiff testified he last worked in 2005 as a dishwasher at a restaurant. He quit working at that job due to his "nerves . . . getting to" him. He experienced panic attacks and "just had to get away from the place" (R. 74). Plaintiff testified the job was not "too bad . . . if [he] stayed in the dish room, but if [he] had to go out and on the busy floor, [he] started getting anxiety" (R. 75). Plaintiff testified he had also detailed automobiles and cut trees for Asplundh (R. 76).

Plaintiff testified he had "back trouble" and anxiety. Plaintiff stated he experienced pain in his neck and shoulders and numbness in his hands. Movement exacerbated his pain (R. 78). Plaintiff described his shoulder pain as "achy" and "sometimes sharp"; with occasional radiation to his hips (R. 80). Plaintiff testified his shoulder pain was exacerbated by standing for "very long . . . .

overexertion . . . . [j]ust about anything physical – mowing, and lifting, trying to push" himself. Plaintiff testified the pain medication did not "seem to last very long" because he had been taking it for "a while." Plaintiff stated his pain was constant throughout the day, "[d]epending on how long a day it" was and "how physical" he got "during the day" (R. 81). Plaintiff stated he did not know how his neck condition limited his ability to work (R. 82). Plaintiff stated he treated his pain with the use of a heating pad and by lying down (R. 84).

Plaintiff stated he was examined by Dr. Hebard every three (3) months (R. 82). Dr. Hebard "check[ed] out" Plaintiff's neck and refilled his medication (R. 82-83). Plaintiff testified Dr. Hebard referred him to Dr. Weinstein, who "ran a bunch of tests" and Dr. Navada, and medicated him for carpal tunnel syndrome. Plaintiff testified he wore the wrist braces every night and they "sometimes" eased his wrist pain (R. 83). Plaintiff stated Dr. Weinstein informed him that surgery was an option, but that Plaintiff was "a little nervous about it being in the neck area" (R. 83-84).

Plaintiff testified he could stand or walk for thirty (30) minutes before he would need to sit or lie down. Plaintiff could bend and squat, but not "very good" because his balance would be affected. Plaintiff stated he could kneel, but it would cause back pain. Plaintiff could sit for twenty (20) minutes and then his arms and fingers would go numb (R. 89-90). He stood, "walk[ed] it off," or "[shook] it off" to relieve the numbness (R. 91). Plaintiff could lift between twenty (20) and twenty-five (25) pounds (R. 91-92). Plaintiff stated he had difficulty holding "things" and that his hands felt like they were burning (R. 92). Plaintiff testified he could pick up coins and pens (R. 93).

Plaintiff testified that he slept for three (3) or four (4) hours nightly because he could not "get comfortable" due to neck pain (R. 93). He could care for his personal hygiene. He testified that he rose, ate breakfast, took medication, lay back down, watched the news, and went back to sleep.

24

Medication made him "drowsy." Plaintiff stated that if he had an activity scheduled, such as going to the doctor, he would not take his medication until he returned. Plaintiff testified he helped his sister with housework. He washed dishes "every once in a" while; he mowed the lawn (R. 94). Plaintiff testified he usually did not go to the grocery store, but on the occasions when he did, he was just "in and out" and he usually sent his sister and his niece for him. Plaintiff stated he did his own laundry but his sister and niece cooked (R. 95). Plaintiff stated he had no hobbies (R. 95-96).

Plaintiff testified his anxiety was caused by his being "nervous" when he was "around people for very long," especially people he did not "know in general" or had not "known in a while" (R. 84, 86). Plaintiff testified his being around people he did not know made him "want to be by myself . . . off to myself" (R. 86). Plaintiff testified he dined out, watched a movie, or played card games with friends once or twice weekly (R. 85). Plaintiff testified he had difficulty with his memory, especially remembering dates and times. He stated he did not have "a lot of memories of the past." Plaintiff stated he could "sometimes" concentrate (R. 86). Plaintiff testified he did not read "often." He sometimes read the newspaper. Plaintiff stated he attempted to finish tasks. Plaintiff testified he had not carved as a hobby for two (2) years (R. 87).

Plaintiff's counsel informed the ALJ that Plaintiff had never undergone a neuropsychological exam but had, "throughout the course of this case" attempted, with the assistance of Dr. Hebard, Plaintiff's primary care physician, to obtain a neuropsychological examination (R. 67-68). Plaintiff's counsel stated that Dr. Hebard had informed him that he [Hebard] had scheduled a neuropsychological examination for Plaintiff for January 5, 2010, but that Plaintiff "indicate[d] that the [did not] know anything about it." Plaintiff's counsel stated that he had experienced "extreme difficulty in dealing with" Plaintiff to "get[] him to understand exactly what's going on. So, if he

25

had one scheduled on the 5th, he missed it." Plaintiff stated that he "didn't realize" that he had the January 5, 2010, neuropsychological examination scheduled and that it was "kind of bad didn't (sic) I went." The ALJ acknowledged this information by stating, "[w]ell, obviously, documentation of this is para mental . . . ." (R. 68). Plaintiff later testified that he was going to undergo a neuropsychological evaluation in the future. Plaintiff testified he was not taking any medication for anxiety and had not received any treatment for that condition (R. 88). Plaintiff stated he had not discussed his mental status "too much" with Dr. Hebard because he was "afraid of some of the medication that they might try . . . will make [him] worse" (R.89).

Upon examination by counsel, Plaintiff testified he could not lift twenty (20) to twenty-five (25) pounds or a gallon of milk for an eight (8) hour work day (R. 96). Plaintiff stated that such lifting would cause "tremendous pain in [the] right side of [his] shoulder and [his] hand." Plaintiff testified that he left the house "every once in a while" when encouraged to do so by his sister. Plaintiff stated he last played cards with his friends two (2) weeks earlier (R. 97). Plaintiff stated he did not change into clean clothes or shower on a daily basis. Plaintiff stated he fell asleep after he took his medication "[a]ll the time." Plaintiff stated that anxiety, "being around people," and "stressful stuff" prevented him from sustaining employment (R. 98). Plaintiff testified that he had not been treated by a psychologist or a psychiatrist because he/she would "probably tell [him he was] crazy" and "[put him] on medication that will make [him] crazy." Plaintiff stated he is "afraid of the medication" for mental health treatment and feared being committed to a mental hospital (R. 99).

The ALJ asked the VE the following hypothetical question:

All right, sir, if you would assume a hypothetical individual of the same age, education, and work experience as the claimant . . . . [who] could perform work at a light – can perform light work with the following limitations. Can perform all postural movements occasionally, except cannot climb ladders, ropes, or scaffolds.

Must avoid concentrated exposure to temperature extremes, excessive vibration, and hazards such as dangerous moving machinery and unprotected heights. Can understand and carry out simple instructions, perform simple, routine, repetitive tasks. Limited to work in low stress jobs, again, defined as involving only occasional simple work related decisions. Few, if any[,] work place changes. And an environment free of fast-paced production requirements. And is limited to [inaudible], which are isolated from the public with only occasional interaction with coworkers and supervisors. Are there any jobs that such an individual could perform? (R. 101-03).

The VE stated jobs existed in the regional and national economy which the a hypothetical person could perform (R. 103).

Evidence Submitted to the Appeals Council

On September 24, 2009, Dr. Hebard completed a West Virginia Department of Health and Human Resources Medical Review Team ["MRT"] General Physical form for Plaintiff. Plaintiff's statement of disability included gunshot wound to the head, depression, chronic back pain, and carpal tunnel syndrome. Dr. Hebard noted Plaintiff's speech, posture and gait were intact (R. 536). Upon examination, Dr. Hebard noted Plaintiff had flat affect; his forward bend was thirty (30) degrees with pain; he experienced wrist pain. Dr. Hebard diagnosed depression, "organic brain syndrome post gunshot," degenerative joint disease of the spine. Dr. Hebard opined Plaintiff was not able to work full time and his inability to work would last a lifetime (R. 537). Dr. Hebard recommended Plaintiff undergo conduction studies relative to carpal tunnel syndrome; be evaluated by a neurologist; and wear braces on his wrist (R. 538).

Christina Wilson, Ph.D., and associate professor in the West Virginia University Behavioral Medicine department, completed a consultative neuropsychological evaluation on March 12, 2010 upon referral by Dr. Hebard. Dr. Wilson noted Plaintiff was referred for the evaluation "to evaluate the extent of his neurocognitive status, apparently after this individual sustained a gunshot wound to the head . . . ." Plaintiff reported difficulty with memory. Dr. Wilson also noted that Plaintiff and

his sister recounted that Plaintiff had sustained two other head injuries. The first "occurred at age 12 when he was hit by a car while riding a bicycle and apparently was severely injured at this time" (R. 517). Dr. Wilson did not review the medical records relative to that accident. Dr. Wilson did review medical records relative to a 1997 accident from which Plaintiff sustained rib fractures, left clavicle fracture, "lung problems," and severe pain. Plaintiff was intoxicated when the 1997 accident occurred. Dr. Wilson also reviewed the medical records of Plaintiff's injuries he received when he was involved in an accident as an infant (R. 518).

Plaintiff reported alcohol use until five (5) or six (6) years ago. Plaintiff reported he experienced pain in his shoulders, back, and hip. Plaintiff did not report "significant difficulties" with his mood, "but his sister report[ed] significant problems with depression and frequent occlusion to his room." Plaintiff reported he resided with his sister, stayed in his room, and occasionally walked to visit a nearby friend. Plaintiff's sister reported she received medical disability benefits but she and her brother experienced "financial stressors" (R. 518).

Upon examination, Dr. Wilson observed Plaintiff had "response latencies," "very limited eye contact," and occasional "mumbled" speech. Dr. Wilson noted Plaintiff "appeared to try his best, although his performance on malingering and measures of exaggeration show[ed] very poor recall and less than expected pattern of performance. Thus, these results may be a suboptimal estimate of his present neurocognitive functioning, but likely reflect his impaired cognitive status rather than intention to under perform." Plaintiff's motor test showed he had no "difficulty with hand praxis, hand precision, hand series, finger oscillation, [and] motor response . . . ." Plaintiff had no "obvious difficulty with auditory or visual functioning" during the sensory perception examination. Dr. Wilson noted that Plaintiff's recollection of the time line of his head injuries differed with his sister's

recollection of those injuries, which could "likely represent[] some confusion or disorientation." Dr. Wilson found Plaintiff was a "limited historian." His voice was normal, and tone, "production and prosody with intact thought form and thought content" was demonstrated. Plaintiff could write spontaneously, "but his writing to dictation [was] printed with some misspellings." Dr. Wilson found Plaintiff's "vocabulary knowledge [was] low average" (R. 519). Plaintiff's letter word list generation was "below average and contrasted with impaired semantic category fluency" since Plaintiff demonstrated no "obvious difficulty . . . with naming, repetition or comprehension." Plaintiff's problem solving capabilities were graded in the low average to mildly impaired. Single word reading speed was slow. Series connection was very impaired. Plaintiff's "[f]unctional capabilities appear[ed] reduced as he was not able to perform tasks such as preparation of a letter for mailing, identification of road signs or use of check or a check book ledger." As to Plaintiff's concentration and memory, Plaintiff could name the date and location of the evaluation and recount recent news headlines. Verbal digit span was five (5) digits forward and four (4) digits backward. Plaintiff's recall declined as the delay interval lengthened when he completed the consonant triad retention task. Plaintiff's verbal memory was graded as "poor and flat." "When verbal information was organized into story passages, he provided the gist of this information immediately after presentation and retained 60% of this information over the 30-minute delay interval with stronger performance noted with multiple choice questions." Plaintiff was able to provide "some details of the simple geometric designs" when his visual retention was tested (R. 520).

Dr. Wilson summarized her findings as follows:

In summary, this 42 year old right[-]handed man was seen for recent neuro[-]cognitive evaluation as part of his plan to apply for disability benefits. Apparently, this man has a complicated medical history[,] which includes multiple neurological issues including serious childhood head injury, gunshot wound to the head in 1988,

another automobile accident in 1997 in which he was ejected from the vehicle, longterm (sic) and significant alcohol use, longstanding depression[,] as well as cervical/lumbar disk disease causing pain. Apparently[,] he has a very limited work history as a part-time resturant (sic) custodian between 2002-2005. Overall, he displays[,] at best, low average intellect and generally intact sensory and constructional capabilities. We did detect a variety of neuro-cognitive difficulties in virtually every domain which was assessed, including slowed motor coordination, attention, executive processes and list learning and simple visual memory. Attributing the etiology of these difficulties will be difficult given his very complex neurological background. Based on these findings, it is difficult to see how he could manage to care for his needs independently or work substantively (R. 521).

On August 31, 2010, Dr. Wilson completed a Psychiatric Review Technique of Plaintiff. Dr. Wilson found Plaintiff met Listings 12.02 and 12.04. She found Plaintiff had organic mental disorders and affective disorders (R. 522). Dr. Wilson found Plaintiff met Listing 12.02 because of his memory impairment, perceptual or thinking disturbances, and disturbance in mood. Dr. Wilson opined that the symptoms, signs and laboratory findings that support her diagnosis were as follows: history of multiple traumatic head injuries since childhood; dementia; chronic memory problems; isolating himself in his room; depressed mood and affect; recurrent depression evidence by a "near-lethal suicide attempt"; no improvement in his symptoms; persistently impaired since 2007; and the findings in her March 12, 2010, neuropsychological evaluation report (R. 523). Dr. Wilson found Plaintiff met Listing 12.04 because he had depressive syndrome that was characterized by anhedonia or pervasive loss of interest in almost all activities; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; and thoughts of suicide in the past. Dr. Wilson further supported her findings by writing the following: "[Plaintiff] appear[ed] to have no interest in any activities at any time; he d[id] not appear to enjoy any hobbies; he d[id] not appear to take joy in any aspect of life. His family report[ed] that he isolate[d] himself and [had] little interaction with others. He require[d] reminders to bathe. Can prepare nothing but

items like a sandwich for himself[] and would not be able to attend to his own personal needs without the assistance of another. [Plaintiff's] memory [was] extremely poor and he has noticeably flat/depressed affect and mood. [Plaintiff's] condition has been at this baseline since at least 2007. He has had no episodes of improvement or regression" (R. 525). Dr. Wilson found Plaintiff's personality disorders manifested themselves in his being seclusive or autistic thinking and experiencing a persistent disturbance of mood or affect. Dr. Wilson noted that "while [Plaintiff] display[ed] these items[,] my testing and observations of [Plaintiff] confirm that these [were] more likely related to his organic damage and his chronic depressive syndrome[] rather than a true personality disorder" (R. 529). Dr. Wilson found Plaintiff had marked degrees of limitation of his activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace (R. 532).

Dr. Wilson noted, in conclusion, the following reasons for her findings:

Based upon the multiple objective neuropsychological tests I administered, based upon the medical records I reviewed, based upon the reports of [Plaintiff's] family, and based upon the mood and affect I observed throughout the interaction with him, I am of the opinion that he regularly displays a significant dementia and accompanying mood disorder, the source of which or exact cause is difficulty (sic) to precisely ascertain. He has had multiple factors of causative agents in his past. Treatment for him is difficult and is generally limited due to the organic factor. His persistently depressed mood factor, taken into account with his memory impairment causes him to function poorly in consistently following even simple instructions and in being able to regularly follow or meet normal expectations or a work environment. I suspect that he cannot adequately care for his every day needs without third-party (presently his sister) intervention (R. 534).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Woody made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act

through June 30, 2006.

2.  The claimant has not engaged in substantial gainful activity since October 1, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3.  The claimant has the following severe impairments: Degenerative disc disease (DDD) of the cervical spine and chronic low back pain; bilateral carpal tunnel syndrome; major depressive disorder (MDD); Anxiety (sic) disorder not otherwise specified (NOS); and a history of alcohol and marijuana dependence (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404,Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with the following limitations: is limited to unskilled work; can perform postural movements occasionally, except cannot climb ladders, ropes or scaffolds; must avoid concentrated exposure to temperature extremes, excessive vibration and hazards such as dangerous moving machinery and unprotected heights; can understand and carry out simple instructions and perform simple, routine and repetitive tasks; is limited to low stress jobs, involving only occasional simple work-related decision, few, if any, work place changes, and no production rate or fast pace work; and can have no contact with the general public, with only occasional interaction with co-workers and supervisors. (SSR 96-5p).

6.  The claimant has not past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on November 8, 1967 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569,

404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## IV.  Discussion

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)).   In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions of the Parties

The Plaintiff contends:

1.      Given the new and material evidence, the ALJ's decision is not supported by substantial evidence because the ALJ did not consider Plaintiff's most

33

disabling condition – cognitive disorder (Plaintiff's brief at p. 6)[2].

2.  The ALJ committed an error of law because he did not address medical opinion evidence indicating Plaintiff could not work, and, given the new and material evidence, the ALJ's decision is not supported by substantial evidence because the treating physician's opinion is not consistent with the ALJ's findings and has not been considered (Plaintiff's brief at p. 8).

3.  The Commissioner has committed reversible error because his Appeals Council failed to provide any explanation of its considerations of the new and material evidence from Drs. Wilson and Hebard (Plaintiff's brief at p. 11).

The Commissioner contends:

1.  The ALJ reasonably accounted for any limitations Plaintiff may have had as a result of his mental impairments (Defendant's brief at p. 11).

2.  Remand is not warranted based on evidence submitted to the Appeals Council (Defendant's brief at p. 14).

3.  The ALJ properly evaluated all medical opinion evidence (Defendant's brief at p. 18).

4.  The Appeals Council did not err in its consideration of additional evidence (Defendant's brief at p. 20).

## C. Appeals Council

Plaintiff argues that the Commissioner erred because the Appeals Council failed to provide any explanation of its consideration of the new and material evidence submitted by Plaintiff. Defendant contends remand is not warranted based on the evidence submitted to the Appeals Council. Pursuant to 20 CFR § 404.970(b), the Appeals Council shall consider evidence submitted with a request for review if the evidence is new, material, and relates to the period on or before the dates of the ALJ's decision. Evidence is material if there is a reasonable possibility that the new

---

[2]Plaintiff argues that the ALJ erred in not considering a neuro-cognitive impairment as medically determinable and severe based on the new and material evidence submitted to the Appeals Council. The undersigned has addressed this contention in Section C below.

evidence would have changed the outcome. *Wilkins v. Secretary, Dept. of Health and Human Services*, 953 F.2d 93, 96 (4th Cir. 1991). Evidence is not "new" if other evidence specifically addresses the issue. See Id. at 96. In this case, the Appeals Council itself stated that it had considered the new evidence – treatment records from Dr. Hebard and evaluation and Psychiatric Review Technique from Dr. Wilson – but "found that this information does not provide a basis for changing the Administrative Law Judge's decision" (R. 28, 31).

The Appeals Council did not further explain its determination, nor, as this Court has consistently found, was it required to do so[3]. There is a conflict among the district courts within the Fourth Circuit in this regard, however. In *Alexander v. Apfel*, 14 F. Supp. 2d 839 (W. D. Va. 1998), the Western District of Virginia held that the Appeals Council erred by not providing the reasoning for its determination. First, however, the regulations do not require the Appeals Council to state its rationale for denying review. See 20 C.F.R. § 404.970(b). Second, as a decision from another district, *Alexander* is of questionable precedential value. Third, in an unpublished opinion decided after *Alexander*, the Fourth Circuit specifically rejected the contention that the Appeals Council must articulate its own assessment of the additional information. See *Hollar v. Commissioner of Social Security*, 194 F.3d 1304 (4th Cir. 1999)(unpublished), cert. denied, 120 S. Ct. 2228 (2000) (citing

---

[3]In the response to the Commissioner's memorandum in support of his motion for summary judgment, Plaintiff argued that the Fourth Circuit recently found, in *Meyer v. Astrue*, 662 F.3d 700 (2001), new and material evidence had been considered by the Appeals Council and review was denied without discussion. That new and material evidence was the only evidence ever submitted in the case by the treating physician. Id. at 706-707. The Fourth Circuit held that no fact finder had made any findings relative to the evidence and opinion of the treating physician in that case and remanded it for that reason. Id. at 707. A distinction can be made between the *Meyer* case and the instant case in that the new and material evidence considered by the Appeals Council in the instant case was not the only evidence in the record from the treating physician; therefore, the Court will evaluate this issue consistent with its established method.

*Browning v. Sullivan*, 958 F. 2d 817 (8th Cir. 1992), 20 C.F.R. § 404.970(b)). cf., *Harmon v. Apfel*, 103 F. Supp. 2d 869 (D.S.C. 2000) (court declined to follow *Hollar* and instead required the Appeals Council to articulate its reasoning in declining review where new evidence was submitted). Finally, a subsequent decision in the Western District of Virginia concluded the exact opposite of the magistrate judge in *Alexander*. In *Ridings v. Apfel*, 76 F. Supp. 2d 707 (W.D. Va. 1999), which was decided after *Alexander*, District Judge Jones held that the Appeals Council was not required to state its reasons for finding that the new evidence did not justify review of the ALJ's decision. Judge Jones expressly disagreed with the magistrate judge's reasoning that the Appeals Council must give a detailed assessment of its failure to grant review in the face of new evidence, citing *Hollar*.[4]

Despite holding that the Appeals Council was not required to articulate its reasoning for denied review, Judge Jones affirmed the magistrate judge's recommendation that Ridings' claim be remanded to the Commissioner, because "substantial evidence [did] not support the ALJ's decision, when reviewed along with [the new evidence]." Id. at 709. Further, in *Hollar*, the Fourth Circuit found:

> The magistrate judge correctly analyzed the entire record [and] found that substantial evidence supported the Commissioner's decision and that the additional evidence submitted to the Appeals Council did not change that finding . . . .

Id. (Emphasis added).

Therefore, the undersigned will consider the record, including the new evidence submitted to the Appeals Council, and determine if the ALJ's decision is supported by substantial evidence.

The administrative hearing occurred on January 14, 2010, at which, the following exchange

---

[4]Judge Jones did cite *Alexander* in a footnote, stating: "At least one other magistrate judge of this district has held that the Appeals Council must articulate some reason for finding that the new evidence does not justify review." Id. at n.6.

occurred between Plaintiff's counsel and the ALJ:

> Atty: Now the other side of this case is more difficult, and that is the mental side. We see in this record that [Plaintiff] has attempted suicide in the past, with – basically shot himself in the head with a shotgun. He continues to have mental fragments, pellets, remaining in his skull from that. I think you'll see here today . . . he suffers from a pretty significant, what I believe, is cognitive residuals of that shotgun injury, but also depression – depression disorder. . . . I feel that he has a degenerative cervical problem, from a physical standpoint[,] and he also has a depressive disorder and cognitive disorder from the gunshot wound (R. 66-67).

> ALJ: Okay, this cognitive disorder that you're identifying, has that been identified by anyone today?

> Atty: I don't believe so, your honor.

> ALJ: Okay, and he's been evaluated, correct? (R. 67).

> Atty: He's had mental status exams. He hasn't ever had a neuropsychological exam, and I will inform you that that's something through Dr [Hebard], his main treating physician at St. Joseph's Medical Plaza – we have actually[,] throughout the course of this case[,] been attempting to get him [a] . . . neuropsychological examination. Now Dr. [Hebard's] office informed me that he had one scheduled on January 5th, 2010. [Plaintiff], on the other hand, he doesn't . . . I've asked him about that a number of times now, and he indicates that he doesn't know anything about it. So[,] it's just again one of those problems where you have extreme difficulty in dealing with [Plaintiff][] and getting him to understand exactly what's going on. So[,] if he had one scheduled on January 5th, he missed it (R. 67-68).

> Pla: I didn't realize that I'd had – that I have one. . . . I know it's kind of bad didn't (sic) I went.

> ALJ: Well, obviously, documentation of this is para mental . . . (R. 68).

On March 12, 2010, Dr. Wilson conducted a consultative neuropsychological evaluation of Plaintiff; Dr. Wilson completed the report of the evaluation on March 29, 2010 (R. 517-21). Additionally, based on Dr. Wilson's evaluation of Plaintiff, she completed a Psychiatric Review Technique of Plaintiff on August 31, 2010, in which she found Plaintiff met two listings (R. 522-35).

37

The undersigned finds this evidence is new, relevant and material. The record contains no other neuropsychological[5] evaluation or a Psychiatric Review Technique based on a neuropsychological evaluation. The evidence from Dr. Wilson relates to the time on or before the ALJ rendered his decision on April 16, 2012; the neuropsychological evaluation occurred on March 12, 2010, and the Psychiatric Review Technique was based on that evaluation. Dr. Wilson's evidence is material in that it could have, had it been considered with the record, altered the ALJ's decision.

The undersigned finds the September 24, 2009, West Virginia Department of Health and Human Resources MRT General Physical form completed by Dr. Hebard, Plaintiff's treating physician, is new, relevant and material (R. 536-38). The MRT is the only such form completed by Plaintiff's treating physician; it was completed well before the ALJ issued his April 16, 2012, decision; it is material in light of the findings of Dr. Wilson contained in her neuropsychological evaluation and Psychiatric Review Technique and the mental assessment completed by Mr. Whaley[6].

The Commissioner speculates that the ALJ would have "given Dr. Hebard's report little or no weight" because Dr. Hebard did not base his diagnosis of organic brain syndrome on any medically acceptable clinical and laboratory diagnostic testing (Defendant's brief at p 16). Plaintiff asserts that Dr. Hebard's diagnosis of organic brain syndrome post gunshot wound to the head should be considered a medically determinable mental impairment and evaluated by the Commissioner

_____

[5]Neuropsychology/neuropsychological: a discipline combining neurology and psychology to study the relationship between the functioning of the brain and cognitive processes or behavior, using psychological testing and assessment to assay central nervous system function and diagnose specific behavioral or cognitive deficits or disorders. *Dorland's Illustrated Medical Dictionary*, 32nd Ed., 2012, at 1270.

[6]As discussed below, the ALJ failed to adequately consider and weigh the opinions and findings of Mr. Whaley.

(Plaintiff's brief at pp. 6-7). On September 24, 2009, Plaintiff was examined by Dr. Hebard and the doctor completed the MRT (R. 487, 536-38). In the MRT, Dr. Hebard opined Plaintiff had a flat affect, wrist pain, and pain when bending (R. 537). Dr. Hebard's summary was Plaintiff had "organic brain syndrome and depression following gunshot of brain" (R. 538). Dr. Hebard opined Plaintiff would be unable to work for either "one year" or a "lifetime" (R. 537). Even though Dr. Hebard's opinion that Plaintiff is unable to work is an opinion reserved to the Commissioner[7], his opinion is supported by the opinion of Mr. Whaley, who found Plaintiff should "refrain from any employment opportunities due to his depressive symptoms and anxiety symptoms[] as well as his medical problems" and his "employment limitations [were] indefinite until his depressive and anxiety symptoms ha[d] been alleviated or ha[d] improved" (R. 483-84).

In the MRT, Dr. Hebard makes a diagnosis of organic brain disorder caused by a gunshot wound. In his decision, the ALJ found the Plaintiff's "representative has alleged a prior suicide attempt with report of metal fragments in [Plaintiff's] head shown in the medical records. Available records in the current period do not include treatment related to a suicide attempt or show how or when the metal fragments came to be. However, giving the [Plaintiff] the benefit of the doubt and assuming there was a prior suicide attempt as suggested, the current medical records pertaining to the relevant time period contain no emergency room visits or hospitalizations for mental health related symptoms, no suicide attempts or ideations, and no mental health counseling, which further

[7]The opinion that an individual is disabled and unable to work is an issue reserved to the Commissioner because it is an administrative finding that is dispositive of a case. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. Section 404.1527(3)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." The opinions of Drs. Hebard and Wilson that Plaintiff is unable to work are not opinions considered by the undersigned.

implies his symptoms are reasonably well controlled" (R. 21).

The undersigned agrees with the ALJ that the record contains no records relative to Plaintiff's alleged 1988 suicide attempt and acknowledges there is no substantial medically acceptable clinical and laboratory diagnostic testing in the record to confirm that Plaintiff sustained a self-inflicted gunshot wound to the head in an attempt at suicide except for a March 30, 2007, head x-ray that showed "several small metallic foreign bodies project in the medial right orbit," which Plaintiff admitted were caused by an "old gunshot wound to head" (R. 371, 407). There are repeated reports in the record by Plaintiff that, in 1988, he attempted to commit suicide by shooting himself in the head with a gun (R. 331, 391-92, 431, 444, 481, 517). Additionally, Plaintiff informed M.A. Morgan that he had been hospitalized for a gunshot wound to the head and had received outpatient psychiatric treatment therefor; informed Mr. Whaley that he had been hospitalized after his suicide attempt; and informed Dr. Klein he had been treated after his suicide attempt (R. 331, 446, 481). Those hospital and treatment records are not contained in the evidence of this case.

The claimant bears the burden of production and proof during the first four steps of the inquiry. See *Hunter v. Sullivan*, 993 F.2d 31 (4th Cir. 1992). If a claimant can carry his burden through the fourth step, the burden shifts to the Commissioner to show that other work is available in the national economy that the claimant can perform despite her condition. See id.

Although the claimant bears the burden of production and proof, it is well understood, at least in this Circuit, that the ALJ has an obligation to develop the record. The case law imposes on the ALJ a duty to develop the record, rather than rely on only the evidence submitted by the claimant, even if the claimant is represented. "[T]he ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record, and cannot rely on the evidence

submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986). The ALJ is permitted to develop the record in several ways, including questioning witnesses, requesting evidence, and subpoenaing witnesses. 20 C.F.R. sections 404.944, 404.950(d). Additionally, the ALJ may request the claimant, at the Social Security Administration's expense, to obtain medical evidence. 20 C.F.R. sections 416.914, 416.917.

In this case, the ALJ failed to obtain any medical records relative to the injury sustained by Plaintiff from an alleged suicide attempt – a gunshot wound to the head. As noted above, metal fragments were found in Plaintiff's head on a March 30, 2007, x-ray; Plaintiff consistently informed physicians that he had attempted suicide in 1988 by shooting himself in the head; Plaintiff informed M.A. Morgan that he had been hospitalized for a gunshot wound to the head; Plaintiff informed Mr. Whaley that he had been hospitalized after his suicide attempt; Plaintiff informed Dr. Klein he had been treated after his suicide attempt; the ALJ discussed the gunshot wound to the head at the administrative hearing (R. 21, 66-67, 331, 371, 407, 446, 481). There is no explanation in the record as to why hospital and treatment records relative to Plaintiff's gunshot wound to the head were not included in the evidence of record, but the ALJ, himself, noted their absence. In his decision, the ALJ found that the records do not include "treatment related to a suicide attempt or show how or when the metal fragments came to be." The undersigned finds it is the suicide attempt and the gunshot wound to the head that are related to the alleged organic brain disorder (R. 21). Even though the ALJ gave Plaintiff the "benefit of the doubt" and "assum[ed] there was a prior suicide attempt," the record is not fully developed relative to Plaintiff's mental and/or possible organic brain disorder diagnosis without the treatment records for the gunshot wound and suicide attempt and the ALJ's decision is not supported by substantial evidence.

The neuropsychological examination was conducted by Dr. Wilson on March 12, 2010, upon referral by Dr. Hebard. According to information elicited at the administration hearing, Plaintiff missed the January 5, 2010, neuropsychological examination; the administrative hearing was held on January 14, 2010; Dr. Wilson conducted the neuropsychological examination of Plaintiff on March 12, 2010, and issued the report on March 29, 2010; and the ALJ's decision was issued on April 16, 2010 (R. 53, 67-68, 517-21). At the administrative hearing, Plaintiff admitted that he forgot to go to the January 5, 2010, neuropsychological examination, and he testified that he would be undergoing such an evaluation in the future.

The ALJ was informed at the administrative hearing that Plaintiff asserted that he had a *cognitive disorder from the gunshot wound*" and considered "documentation of this . . . para mental," thereby noting his recognition that the condition was not exclusively a mental disorder (R. 67) (Emphasis added). The ALJ was aware that Plaintiff had been scheduled for and did not go to a neuropsychological examination that was scheduled five (5) days before the administrative hearing and would be undergoing such an examination in the near future; however, the ALJ failed to ask if Plaintiff had rescheduled the missed appointment. Additionally, even though the ALJ has no duty to leave the record open for the submission of new evidence, in this case, the ALJ was aware that a neuropsychological examination relative to a cognitive brain disorder was to be conducted in the near future and failed to leave the record open for a specified period of time in order for Plaintiff to obtain and submit such a medical record for his consideration prior to his rendering his decision. It must be noted that Dr. Wilson's neurological examination was completed only two (2) months after the hearing and two (2) weeks prior to the ALJ's decision.

As to that neuropsychological examination, it is also very important to note that Dr. Wilson

42

made several findings in her report that were different from but consistent with the findings made by Mr. Whaley, who administered the WASI test, WRAT - III, and MCMI - III and conducted a clinical interview and mental status evaluation in March and April, 2008, in an effort to determine if Plaintiff should receive employment training and could live independently. In the neuropsychological examination, Dr. Wilson recounted the head injuries Plaintiff had sustained throughout his life – one when he was an infant as a result of a motor vehicle accident, one during a suicide attempt, and one in 1997 that was caused by a motor vehicle accident (R. 518). Dr. Wilson noted Plaintiff had "response latencies," "very limited eye contact," and occasional "mumbled" speech (R. 519). In his examination of Plaintiff, Mr. Whaley found he was introverted and had depressed mood and flat affect and "showed . . . schizoid characteristics, depressive characteristics, self-defeating characteristics, anxiety characteristics, alcohol dependence and major depression characteristics" (R. 483). Dr. Wilson noted that Plaintiff's recollection of the time line of his head injuries differed with his sister's recollection of those injuries, which could have been caused by confusion or disorientation.[8] Dr. Wilson found Plaintiff was a "limited historian" (R. 510). Plaintiff stated to Mr. Whaley that his sister prompted him to "help out with certain things, otherwise he would generally forget . . ." (R. 482). Dr. Wilson found Plaintiff could write spontaneously, "but his writing to dictation [was] printed with some misspellings" and that his "vocabulary knowledge [was] low average" (R. 519). Plaintiff's letter word list generation was "below average and contrasted with impaired semantic category fluency" since Plaintiff demonstrated no "obvious difficulty . . . with naming, repetition or comprehension." Plaintiff's problem solving capabilities

---

[8]Earlier in the evaluation, Dr. Wilson noted a head injury that occurred when Plaintiff was twelve (12) years old. It was unclear if Plaintiff or Plaintiff's sister recounted this experience (R. 517).

were graded in the low average to mildly impaired. Single word reading speed was slow (R. 520). These findings coincide with Mr. Whaley's findings that Plaintiff had significant difficulty with reading, spelling and completing simple math and that Plaintiff's proficiency in spelling and reading had significantly regressed since 2001 (R. 482). Dr. Wilson found Plaintiff's series connection was very impaired. Verbal digit span was five (5) digits forward and four (4) digits backward. Plaintiff's recall declined as the delay interval lengthened when he completed the consonant triad retention task. Plaintiff's verbal memory was graded as "poor and flat." "When verbal information was organized into story passages, he provided the gist of this information immediately after presentation and retained 60% of this information over the 30-minute delay interval with stronger performance noted with multiple choice questions" (R. 520). Dr. Wilson found Plaintiff displayed, at best, low average intellect. She found "a variety of neuro-cognitive difficulties in virtually every domain which was assessed, including slowed motor coordination, attention, executive processes and list learning and simple visual memory (R. 521). Mr. Whaley found Plaintiff's ability to think or concentrate was diminished; his immediate and recent memory were mildly deficient; his concentration was mildly deficient; his psychomotor behavior was fidgety and tense; and he had significant distress or impairment in social, occupational, and interpersonal relationship functioning (R. 482-83).

Most significant was Dr. Wilson's finding that Plaintiff's "[f]unctional capabilities appear[ed] reduced" because he was not able to perform tasks such as preparing a letter for mailing, identifying road signs or using checks or a check book ledger. She further opined that it was "difficult to see how he could manage to care for his needs independently or work substantively" (R. 520, 521). This opinion was supported by Mr. Whaley, who found Plaintiff should, due to his emotional and physical needs, continue living with family members who could help and support him

44

and could not work indefinitely until his symptoms had been "alleviated or improved" (R. 483-84).

Dr. Wilson's findings in the Psychiatric Review Technique are supported by Mr. Whaley and Dr. Sabio. Dr. Wilson found Plaintiff met Listing 12.02 because of his memory impairment, perceptual or thinking disturbances, and disturbance in mood and based this finding on Plaintiff's history of multiple traumatic head injuries since childhood; dementia; chronic memory problems; isolating himself in his room; depressed mood and affect; and recurrent depression evidence by a "near-lethal suicide attempt"; and no improvement in symptoms (R. 523). Dr. Wilson found Plaintiff met Listing 12.04 because he had depressive syndrome that was characterized by anhedonia or pervasive loss of interest in almost all activities; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; and thoughts of suicide in the past (R. 525). Mr. Whaley found Plaintiff experienced diminished ability to think or concentrate, depressed mood, loss of energy, feelings of worthlessness, diminished pleasure and interest in all activities, "fidgety and tense" psychomotor behavior, and schizoid, self-defeating, and anxiety characteristics. Mr. Whaley found Plaintiff's depressive symptoms had lasted for several years (R. 482, 484). Dr. Sabio found Plaintiff's affect was visibly constricted and he had psychomotor retardation (R. 432). Dr. Wilson "suspect[ed] that [Plaintiff could not] adequately care for his every day needs without third-party (presently his sister) intervention" (R. 534). Mr. Whaley recommended Plaintiff "continue living with family members [who could] help and support him due to his emotional and physical needs" (R. 484).

Defendant argues that the new evidence from Drs. Hebard and Wilson does not warrant a remand; the undersigned disagrees. Plaintiff had reported head injuries from two (2) motor vehicle accidents and had consistently reported he had attempted to commit suicide by shooting himself in

the head. Plaintiff has metal fragments in his head. Plaintiff stated that he had been hospitalized for the gunshot wound and had received psychiatric treatment relative to the suicide attempt. Plaintiff had been diagnosed with depressive disorder and anxiety. Plaintiff did not attend a January 5, 2010, neuropsychological examination because he said he did not know he had it scheduled; he stated he had one scheduled in the future. The ALJ acknowledged that Plaintiff had missed a neuropsychological examination and he had one scheduled in the future but did not develop the record as to when that evaluation was or would be scheduled. The ALJ did not develop the record relative to Plaintiff's gunshot wound. The findings of Drs. Wilson and Hebard are supported, in part, by the record of evidence. For the above reasons, the undersigned finds that the Commissioner's decision is not supported by substantial evidence.

### D. Weight to Consultative Examination

Plaintiff argues that the ALJ failed to adequately evaluate or weigh the opinion of Mr. Whaley, who completed a comprehensive evaluation of Plaintiff in March and April 2008 (R. 480-84) (Plaintiff's brief at pp. 9-10). Defendant asserts the ALJ did not err (Defendant's brief at p. 19).

As to Plaintiff's mental status, the ALJ found, in part, the following:

> The claimant has received no formal mental health treatment. Treatment to date has consisted solely of intermittent medication from the claimant's primary care provider. The claimant's representative has alleged a prior suicide attempt with report of metal fragments in claimant's head shown in the medical records. Available records in the current period do not include treatment related to a suicide attempt or show how or when the metal fragments came to be. However, giving the claimant the benefit of the doubt and assuming there was a prior suicide attempt as suggested, the current medical records pertaining to the relevant time period contain no emergency room visits or hospitalizations or mental health related symptoms, no suicide attempts or ideations, and no mental health counseling, which further implies his symptoms are reasonably well controlled.

The ALJ opined the following:

As for mental impairment, the State Agency psychological consultant opinion (Exhibits B16F, B17F) is generally consistent with the overall medical evidence of record, (sic) and is afforded substantial weight (R. 21).

The ALJ considered the following opinion of Mr. Whaley:

Patrick Whaley, MA, a psychologist who completed an examination of the claimant on April 1, 2008, noted low achievement test scores for the claimant in reading, math and spelling, and suggested that these scores could indicate a possible learning disability in these areas. However, neither Mr. Whaley nor any other treating, examining or evaluating provider ever made a diagnosis of a learning disability. Accordingly, the undersigned finds that there is no medically determinable impairment of learning disability in this matter. However, the claimant's intelligence and achievement test results, and providers' observation and evaluations regarding any deficits in this regard, have been fully considered and evaluated in combination with the remainder of the claimant's impairment to reach the residual functional capacity assessment . . . (R. 17).

The regulations clarify that ALJs "are responsible for reviewing the evidence and making findings of fact and conclusion of law." 20 C.F.R. § 416.927(f)(2). In doing so, the ALJ must consider the findings of state agency consultants as evidence from a non-examining physician, but he is "not bound by any findings made by state agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 416.927(f)(2)(I). In evaluating a consultant's findings, the ALJ must consider the consultant's expertise, supporting evidence in the case file, the explanations of physicians of record, "and any other evidence relevant to the weighing of opinions." 20 C.F.R. § 416.927(f)(2)(ii). The ALJ did not err in considering the opinion of the state agency physician; however, the ALJ based his RFC of Plaintiff's mental impairment only on the state agency psychologist's Psychiatric Review Technique and Mental Residual Functional Capacity Assessment, both dated July 1, 2008, and both based exclusively on the findings of Dr. Klein, a licensed psychologist who completed a mental examination of Plaintiff on June 25, 2008. The ALJ did not consider or weigh the entire opinion of Mr. Whaley (R. 444-47, 448-465, 480-84).

As noted above, on March 11, and April 1, 2008, three months prior to the state agency psychologist's completion of the Psychiatric Review Technique and Mental Residual Functional Capacity Assessment, Mr. Whaley administered the WASI test, WRAT - III, and MCMI - III and conducted a clinical interview and mental status evaluation in an effort to determine if Plaintiff should receive employment training and could live independently. In addition to finding that Plaintiff's test scores were low in reading, math and spelling as noted by the ALJ, Mr. Whaley diagnosed major depressive episode, moderate, recurrent, and anxiety disorder, not otherwise specified. He found Plaintiff's GAF was 50 (R. 483).

The ALJ did not follow the requirements of 20 C.F.R. §404.1527. The ALJ explicitly rejected Mr. Whaley's opinion that Plaintiff may have, based on his scores in reading, spelling, and math, a learning disability, but he did not assign any weight whatsoever to Mr. Whaley's opinions and findings, which included a diagnosis of major depressive disorder, moderate, and anxiety disorder, NOS, and opinion that Plaintiff's GAF was 50 (R. 483). Mr. Whaley found Plaintiff showed areas of concern with schizoid, depressive, self-defeating, anxiety and major depression characteristics; Plaintiff had depressed mood most of the day, diminished pleasure and interest in all activities, loss of appetite, insomnia, loss of energy, and feeling of worthlessness (R. 483). Neither Dr. Klein nor the state agency psychologist made any findings in these areas. Mr. Whaley found Plaintiff had significant distress or impairment in his social, occupational, and interpersonal relationship functioning (R. 483). Both Dr. Klein and the state agency psychologist found Plaintiff's social functioning was only mildly deficient (R. 446, 463). Additionally, Mr. Whaley recommended Plaintiff refrain from any employment opportunities due to his depressive and anxiety symptoms and noted Plaintiff's employment limitations would be indefinite until his depressive and anxiety

symptoms had been alleviated or improved; Dr. Klein and the state agency psychologist made no finding in this area (R. 447, 458, 483-84). Mr. Whaley opined that Plaintiff should "continue living with family members that can help and support him due to his emotional and physical needs"; Dr. Klein found Plaintiff was able to manage his own finances and the state agency psychologist made no findings as to Plaintiff's ability to live independently (R. 447, 484). The ALJ found that, during the relevant time period for Plaintiff's claim, his mental impairment symptoms were "reasonably well controlled" because he had not sought treatment at an emergency room or hospital, had not had any suicide attempts or ideations, and had received no mental health counseling. That opinion is not supported by the findings of Mr. Whaley, who found Plaintiff's depressive and anxiety symptoms were not controlled, According to Mr. Whaley, Plaintiff's employment limitations would be indefinite because of those limitations, he should complete several months of individual therapy and medication management for his depressive and anxiety symptoms in order to just be reevaluated for possible employment; and, due to his physical and emotional impairments, he could not live independently. The ALJ did not consider this opinion (R. 483-84).

The ALJ relied on the state agency psychologist's opinion in formulating Plaintiff's RFC because it was, according to the ALJ's opinion, "generally consistent with the overall medical evidence of record"; however, that state agency psychologist's findings were not consistent with the findings of Mr. Whaley, whose entire report was neither considered nor assigned weight by the ALJ; therefore, the Court cannot determine if the ALJ's findings are supported by substantial evidence.

The Fourth Circuit has held, in *Gordon v. Schweiker*, 725 F.2d 231 (4th Cir. 1984): We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. *See, e.g., Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980); *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977). As we said in *Arnold*: The courts . . . face a difficult task in applying the

49

substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the weight given to the various medical reports submitted by the appellant. We therefore remand to the district court with instructions further to remand the case to the Secretary with directions to the Secretary to reconsider the case and to indicate explicitly the weight accorded to the various medical reports in the record.

Inasmuch as the ALJ failed to consider all or weigh any of Mr. Whaley's report, which differed from the opinions of the state agency psychologist, to whom the ALJ gave substantial weight, the undersigned finds the ALJ's decision is not supported by substantial evidence.

## VI.  RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying Plaintiff's applications for DIB and for SSI.  I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Report and Recommendation/Opinion.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*,

474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _27_ day of _July_ , 2012.

_____
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE